with me with the court's permission is Linjia, a graduating law student from the University of Washington, who assisted me on this appeal. Your Honor, I'm sharing defense argument time with my colleague, Jay Nelson, who represents Diane Erdman, the co-defendant from trial in this matter. We've submitted some discrete issues for the court for each of our clients,  that we would like to emphasize in our shared argument. With the court's permission, I will begin by addressing our substantive challenge to the fraud convictions, in particular, the bouillon sale fraud convictions. And Mr. Nelson will emphasize the jury trial selection issues and sentencing. Your Honor, our challenge that we share to the bouillon sale convictions in this case that were charged as wire and mail fraud, now centers on this court's very recent decision in the Millheiser case, just one month ago today. In that case, that court confirmed and clarified the meaning of deceive and cheat as the essential element for federal criminal fraud, as defined in this court's jurisprudence, such as the Miller case, which the parties discussed extensively in the briefing. And Millheiser made clear that not any deception or lie alone that facilitates or induces a commercial transaction establishes federal criminal fraud. Rather, the lie or deception alleged by the government must establish a deception that goes to the nature of the bargain in the transaction itself. And this court in Millheiser made clear that a party's interest in a transaction to accurate information or full disclosure is not itself a thing of value, an essential element of a commercial transaction for federal criminal fraud purposes. Instead, Millheiser emphasized, the nature of the bargain means something essential to the transaction, not collateral, such as price or quality, or something else in the context of the particular transaction that was essential to the sell and buy. Well, that's a great point, I think, because Millheiser did use that language, but wasn't there testimony at trial from customers and salespeople that some of these representations, like shipping timelines and locking in the prices, were considerations in the decisions to purchase? Why doesn't that fall right within the nature of the bargain? Well, there's the issue of what the evidence from the record can establish for appellate review purposes, and then also the concern we have, Your Honor, about how the jury was instructed and whether the jury actually reached the essential element defined by Millheiser for criminal fraud and denied the defense the opportunity to argue exactly these facts to the jury consistent with the laws defined by Millheiser. But, Your Honor, the government's theory at trial was then, and this is clear, you can see on page 30 of the government's answering brief in the Hansen matter, as well as in record portions of the closing argument that I outlined in pages 38 to 39 of my opening brief, the government's position to the jury, and this would be consistent with the instructions the court gave, was that my client and the co-defendant used misrepresentations about delivery timelines and the availability of refunds to induce the transactions. But the record is also quite clear from voluminous testimony that the defendants, our clients, never intended to deny anybody the essential element of the bargain of the nature or quality of the gold and silver they were purchasing, that the representations about price were deceptive or not true or accurate, or that our clients never intended to deliver the evidence was consistent. Isn't that a question for the jury? Because it seems like Mr. Hansen and Mr. Erdman deprived customers of the nature of their bargain insofar that their company delayed or did not fulfill thousands of bullion orders. So when you get to that number, um, how is it that they intended to fill that when that became very clear that they were not going to? I mean, it seems to go to intent. It's the nature of the bargain. I'm not sure how, um, Millheiser helps you here. Well, Your Honor, I would say that actually your concern is very analogous to the situation the court addressed in Millheiser. The court in Millheiser was looking at a very expansive record, thousands of pages of transcript with many victims of the alleged fraud, as we have here, and many variations on the theme of alleged deception about delivery timelines. The testimony presented many disputed questions of fact. Many witnesses said we came to Northwest Territorial Mint because of our prior experience that was good and also because of the quality and price that they were willing to offer. They even renegotiated timelines to be able to maintain the quality and price of the precious metals they wanted to purchase. I just want to be clear because I thought you were starting out arguing about the sufficiency of the evidence, and then you shifted to the jury instruction. Well, we're arguing both, and the district court was given a combined Rule 29, Rule 33 motion. Our principal argument is that the government did not prove its case at trial under the federal criminal fraud statutes as defined by Millheiser and the other authorities that we discussed from other circuits that we argued clarified Miller. But the denial of the jury instruction that our clients requested to clarify in particular instructions 21 and 23 about good faith and the role of an intent to repay, which was very germane here because of the role of refunds in this case, denied the defense to our the ability to argue exactly this defense because this is the defense that was argued to the jury that the issues of timelines and What was the jury instruction you proffered? The jury instruction we proffered, you can find the jury instruction colloquy in volume 14, and it runs from pages 2705 to about 2709, but in particular 2707-08. And what the defense requested was that the court modify the standard model instruction about good faith and intent to repay to more clarify in context that the issue here for the jury was whether the sort of haggling and perhaps misrepresentation about timelines and delivery. Did they offer an instruction or, I mean, I'm trying to figure out what it was that the specific language requested was that the intent to establish cheat was to cause financial harm to the customers, particularly in the context of a business that, yes, in the end folded and denied many people of the benefit of what they had hoped in the transaction, but delivered... But the court didn't feel, I mean, you had the standard jury instructions when you put them together permits you to make exactly that argument, right? Well, what I would say, Your Honor, in Millhiser, the court made clear... First answer my question. Was there anything given the structure of the jury instructions taken as a whole that would have in any way circumscribed your ability to make the argument you're making to us and presumably made, and you did make to the jury? I would say yes, particularly in the context of the government's arguments. The instructions taken together made clear that if Mr. Hansen and Ms. Erdman used deception to induce a transaction to cause money to change hands, that deception was sufficient for federal criminal fraud. And the government extensively argued that theory to the jury in closing argument. It's the position that the government took in its answering brief, but Millhiser forecloses that expansive theory for federal criminal fraud. And instead, the deception needs to go to the heart of the nature of the bargain. And the jury instruction that was requested, Your Honor, was that the district court tell the jury that the deception had to cause financial harm in the transaction, not merely, for instance, delays in expected delivery timelines. And this is in the context of a business that had been running for years and had fulfilled thousands of deliveries as customers expected with the quality and price. Some of the harmed customers here were returning customers because of their prior experience. Your Honors, I see that I'm down to one minute and I'd hope to reserve a minute for Jane Elson. Thank you. Good morning, Your Honors. Jane Elson on behalf of Diane Erdman. As Mr. Holland said at the beginning of his time, I'd like to focus my time on the juror bias issue with one quick point about the Millhiser issue, if I may just briefly. We have a citation in our opening brief, Ms. Erdman's opening brief, pages 12 to 13. We collect some evidence from the trial record showing that actually the representations at issue were not particularly important to a number of, if not all, of the witnesses who testified at trial. And so that was at a bare minimum, a contested point factually at trial. If I may turn to the jury selection issue, I think this case calls for a relatively straightforward application of the Kachedzian case. We have juror number 34 who responded to defense counsel's question that Mr. Hanson and Ms. Erdman must have done something because the government filed these fraud charges against them and was spending so much time on them. Now that answer clearly suggests either a pro-government bias or an anti-defense bias or both. And it also suggests a struggle with the presumption of innocence. And in compounding that, the juror was never rehabilitated and never unequivocally said that they could be fair and impartial insofar as they would denounce the prior statement suggesting, the prior response suggesting partiality. I think this seems different than the unpronounceable Kachedzian case where the juror really said they couldn't put the bias aside. And here, even if you admittedly point out there's some eyebrows, eyebrow-raising statements here, she went on to clarify this. She says, everyone charged with anything deserves the best defense they can get. So if there is a technicality, that's a legitimate technicality. And then she says that's the way the system should work. So it seems to me that this juror did something that didn't happen in the Kachedzian case and basically said, that's how the system does work. You get the best defense. And if there's technicality, there's technicality, but you would still be able to be convicted on that or get off on that. I think conceptually, we're talking about different issues. Okay. Because I think when we're, that round of questions related to the juror's perspective on defense attorneys and the defense function generally, the initial question addressed a really common issue that is conceptually distinct, I think, which is kind of colloquially, I would say, where there's smoke, there's fire. And to anybody on the defense side, particularly of a criminal case, we're always concerned about that at jury trial. Because the government comes in with credibility, dutiful public servants trying to protect everybody, and not everybody sees the scales tilted that way. But on that particular issue, some people do, including juror 34. So I think what we... You have to get over the plain error, which of course is not your fault. But how do you get over that standard here? Well, number one is, I think we have tension that we've cited in the court's case law about whether plain error review even applies to this particular kind of issue. So we have some precedent suggesting that we can just treat it as de novo review of a structural error. Functionally speaking, because we're talking about a structural error, it actually doesn't really matter. Because what we have is also case law saying that if we establish the structural error, that necessarily satisfies the third and fourth prongs of the plain error test. So if we establish structural error, we establish plain error as well, Your Honor. And I think on the substance of the juror's comment, the primary response that we've seen from the government is to sort of downplay it and say, it wasn't that big a deal. The juror was just sort of acknowledging a passing thought that was suggested by Hansen's attorney. And I would ask the court to reject that characterization. Because as I was trying to say earlier, this is an incredibly important issue to anybody, particularly in a criminal case. I would imagine, I have less experience with civil, but I would imagine as a civil defendant, you would want to tease out jurors who are inclined to believe that we wouldn't be doing this if the plaintiffs didn't have something really meritorious to say. And so if you look at the transcript, Hansen's attorney had a long windup to ask this question. And it was a big deal to him. And four people raised their hands and said, yeah, we believe that where there's smoke, there's fire. And then unfortunately, this particular juror seems to have fallen through the cracks because he did fastidiously try to address each of the jurors who raised their hands. And so what I think happened on a fairest reading of the transcript is that in a busy trial, things are moving fast. Things are complicated. It's a huge case. Juror number 34, unfortunately, slipped through the cracks. But what we have from the Kachedzian case is the judge's sua sponte responsibility to pay close attention and to enforce the Sixth Amendment rights of the defendants and say, you know what? I'm troubled by that answer. It suggests a possibility of bias. And I have a duty to inquire, either to or to strike them if I can't rehabilitate them. And we see this in voir dire transcripts and in jury selection all the time. It's a never-ending process of bias, rehabilitate, no, strike. But juror 34 clarified on follow-up and said, believed we have to follow the letter of the law and that if the defendant prevailed on a technicality, then that's the way this system should work. It seems like the burden that you have is so high right now. The judge has to make a determination that he was so impermissibly biased that he was required to strike. And I'm just not quite sure with the follow-up questions that that standard is met. What I would say in response to that, Your Honor, is that I would refer the court so that you don't have to listen to just me. I would refer the court to Judge Wallace's concurrence in the unpublished merit decision that we cited for the court, because Judge Wallace was critical of Katchezian. He did not, does not like the rule that the court adopted in Katchezian. And in criticizing the rule, he characterized his understanding of the rule. And that includes the idea that if the judge, if the juror says something that suggests the possibility of bias, the judge has a responsive duty to inquire. Yeah, but in that case, the juror number three was asked three times if she could be impartial. Not only were all of her responses, or number three's responses equivocal, but she explicitly noted that she was unsure if she could put her personal biases aside. And I'm just not sure that that is similar to what you have here, especially under the on its own, based on the discussion that happened, needed to make that determination, that it was just impermissible to have the juror on the panel. Well, the judge had a duty to inquire and the failure of inquiry, maybe the judge would have cleared it up. I agree, but we don't know. The problem is that we don't know. So what we have is a juror who raised his or her hand to say, these people must have done something wrong because the government brought us here. And that because conceptually, the comments later about the defense function generally, didn't really speak to the issue of the credibility of the government and what they bring to the room when they bring everybody in here to try a federal criminal case. Counsel, if I could just interject, it would seem then the rule you would want us to take away from that Kachechian, however you say that name of the case, is that if a juror says, yeah, sometimes I automatic for cause strike. It's an automatic duty to inquire. And if the inquiry doesn't happen, then we have a problem because we have a problematic answer hanging in the record that is uncured. Fair enough. But in light of the comments, so what you're saying then is that the comments that juror made later does not absolve the district court's opportunity to or obligation to inquire. Correct. Because it addresses conceptually distinct. You're saying two different things. Fair enough. Unless the court has further questions, if I may reserve the rest of my time. Okay. Thank you. Good morning. May it please the court. Tanya Culbertson on behalf of the United States. I'm happy to address any of the issues in the briefs, but because opposing counsel has focused on these two issues at argument, I'll start with sufficiency and then turn to juror bias. On sufficiency, in 2015, the jury heard in a conversation with the Mintz in-house counsel where he was warned that his business practices were fraudulent. Hanson said, quote, he was so far behind that he simply could not stop. Now, it seems that the panel has asked a lot of questions about the importance of the various misrepresentations, especially as to timing. The representations as to timing do go to essential aspects of the transaction. There is sufficient evidence in the record for the jury to make that determination. Well, in your view, then, how is Milheiser relevant to us or not relevant to us? So Milheiser is relevant. It says you look at each transaction, the nature of this particular kind of transaction, and different things for different transactions are going to go to the heart of the bargain. Here, we know that timing goes to the heart of the bargain in part because of Hanson's own words. So we have testimony in the record from Erin Robinson, one of the sales directors, who says that she went to Hanson and said, please, can we give more realistic lead times? We are getting so many customer complaints. This is incredibly difficult for customer service. And he said he couldn't quote longer delivery times because he thought it would dissuade customers from purchasing. So the timeline of delivery is part of the solicitation, part of the offer made to the buyer. We also know that the buyers cared about it because of the volume of complaints that were coming in. This all started because back in 2008, there were so many complaints that the Attorney General's Office began an investigation. So I think it's unrealistic to suggest that timing was not important to the customers. And that makes sense given that this is investment-level gold buying. These customers, because of all of the representations made to them, thought that they were buying a 100% chance that they would get their bullion in the promised timeframe, or else they would get a refund that would make them whole, so that would account for any change in the market fluctuation. Well, we focused, I think, on questions with defense counsel more on the misrepresentation. So that's the intent to deceive part of it. But weren't they also, they were hoping everything would turn out okay. And so you have the second half of this, which we haven't talked about, and that's this intent to cheat. Could you address that? Certainly. I think it's clear that they hoped everything would turn out okay, and they made that defense to the jury. But I think the jury rejected it because it simply was not plausible that these defendants could have a good faith belief that they could meet the representations that they were putting forward. At this point, by 2008, they were already sending out these excuses about unprecedented demand, and that is why your order is late. By 2011, they were already poaching metal from storage to fill customer orders because they were so far behind. And their own data from their own systems shows that from the end of 2014 until the bankruptcy in 2016, of 11,000 of these relevant bullion orders, only 518 were delivered within the 8-10 week, the original 8-10 week time frame. And then beyond that, only 2,000 more were delivered within the 14-week extension time frame. The rest of those were going past the drop dead date. So for them to continue to misrepresent that they could meet these timing promises and deliver this But they're tying that now to the jury instruction. Can you talk about that? Sure. So I would go back to what Judge McEwen said about looking to the jury instructions as a whole. They were certainly allowed to present their theory of the case. They wanted the intent to cause financial harm to the victim as the instruction. There's no support for that in this court's case law. It's deceive and cheat. And that requires depriving the victims of money or property. Framing it as an intent to cause financial harm, I think, risks actually confusing the jury because of the instruction that intent to repay is not a defense. I think that sends the jury down the road of thinking about, well, is it permanent financial harm? Is it temporary financial harm? What does that mean? You know, on its face, wire fraud is depriving of money or And that is what we have here. Can I ask you a question about Millhiser? And I know I've been fine. I don't think the government sought in bank review in that case, correct? I think that's correct. All right. So I'm not asking you to defend Millhiser. I'm asking you to help me understand it. Here's the hypothetical. So I'm outside of a grocery store. There are two tables. One table is a young girl saying, please buy my cookies. They're for a fundraiser for us to go on a trip. Right next to her is another table. There's a girl saying, please buy my mom has cancer. I see those two tables. Cookies are the same, same price. Look, the trip is nice, but you know, the mom's got cancer. So I want to buy the cookies for the girl who says her mom has cancer. Actually, it's for her mom to get plastic surgery. And had I known that, I'm like, well, I'm going to buy the cookies from the girl who wants it for the trip. Not because her mom wants plastic surgery. But the cookies are the same. The price is the same. Under Millhiser, the girl who says, or the mom, say the mom's the co-schemer, the mom who's putting her up to this to say, hey, tell them it's for my cancer when it's really for my plastic surgery. Under your view of Millhiser, is that fraud? And assume I use a phone or something to get a wire transmission out of it. I think that that's a great hypothetical. And I think that that is not necessarily fraud under Millhiser, but that is certainly not what we have. And I agree there are differences. I'm just trying to understand because I always thought the test, and again, I'm putting you in a tough spot, but I always thought that you're here. I always thought the test was materiality. And that was the way we determined whether something did go to the core or something was integral to the transaction. And now it seems like we have this other test that I'm not exactly sure what it is. I agree. I think it is a little bit difficult to parse. And I also had understood sort of materiality. If it is material to your decision to part with your money or property, then it should fall within it. I think, again, I don't want to overstate Millhiser. It does say you have to look at each transaction. And sometimes, it cites back to the case, and I'm blanking on the we have all of these sort of famous investors involved in our company. And that, I think, Millhiser says that still survives because the kind of transaction there is an investment transaction where it's very important, your belief about the strength of the company. And so in that circumstance, it may be that, yes, you are investing in the company, and the company is perhaps giving you some returns, but that could still be a material misrepresentation, and it could be one that goes to the heart of the bargain. So I don't want to go too far out of line with Millhiser. But I would just say, again, that is so far afield from where we are here. Okay. If there are any other questions on sufficiency, I'll turn to the juror bias. So as we stated in our brief, our position is that this claim is actually waived, not just forfeited. I know my colleagues on the other side said, well, they failed to object to the jury as picked and as seated after being given a full opportunity to question. And that is a knowing and purposeful relinquishment of a right to challenge for cause. They clearly knew or should have known the purported basis for an objection because it was elicited by their own questioning. So our position is that this court should follow the approach of the second, fourth, eighth, and tenth circuits and just simply conclude that this is waived. So you could never bring a post-conviction jury bias claim in that case because once you have the jury seated, I've made my objection, I've used my peremptories, the judge asks the general question, everybody says yes. Now you are foreclosed forever from bringing a jury bias claim under your argument. I mean, perhaps that happens, right? I mean, you can waive constitutional claims, claims of constitutional dimension. You can, but, you know, look at the practical aspects of how things are run at trial and what the jurors, what the lawyers say when the judge asks that question. So maybe I should ask a better question, and that is how could someone bring a post-conviction juror bias claim other than leave habeas aside? Okay. My answer was going to be habeas. I shut off that afternoon. That's fine. And I take your point on this, and if the court does not want to adopt that standard, I would certainly fall back on plain error, which I think is what should apply here on the circumstances that we have if the court is not going to deem it waived. All these cases are a little different and all the jurors are a little different, but this juror doesn't actually make a statement that gets to the heart of I can be fair. I don't think that's quite right. I think she or he or she talks at great length at every opportunity about sort of the pride they took in serving on a jury before, on a jury before, the fact that they've had some, you know, exposure to law enforcement, but that wouldn't stop them from being impartial. They talk about their pride in setting aside personal knowledge that they had about one of the locations involved in a case on which they sat on the jury and how proud they felt at being able to do that. I also, and this is something that hasn't been aired yet in argument, but there was some subsequent questioning by Hansen's counsel after, you know, he had everybody raise his hand, and he talks at great length about, you know, the reason I'm asking that question, does anyone have that thought cross their mind, is because the presumption of innocence is so important. And he spends a couple of pages explaining the presumption of innocence, and then he says, does anybody have a problem with that presumption? Nobody raises their hand. You know, he says, does anybody think that that presumption should be different? Nobody raises their hand. So I think that, in combination with all of the subsequent statements from Juror 34 is enough that it was not plain to this judge that he had a duty to intercede here and further question. And I would even say that, you know, the statements that the court has quoted here from Juror 34 show that that juror was potentially a good juror for the defense, saying, you know, I understand there's technicalities. That's, I don't love that, but of course that's how the system works. Everybody should get a fair defense. And so it may well be that, you know, the defense was happy to have this person on the jury. I mean, it seems that as the defense counsel, there may be reasons to, you want a very chatty juror who kind of spouts off all the time. That might be someone you would actually want on your jury, because they're not necessarily going to go along with whatever the prosecutor is saying. Right, right. That's exactly right. And, you know, on this structural error point, I just want to say that, you know, the work that Plain Error is doing here is, it is a structural error if you find actual or implied bias. Here, there is no finding of actual implied bias. There's no request to make that finding. There's no sua sponte finding, because none was merited. And so in that circumstance, the review has to be Plain Error. And if the rule were otherwise, then, you know, as Judge Wallace expresses in his Incurrence and Merit, a defense counsel could sit back, you know, not ask any follow-up questions, hope that the court doesn't ask any follow-up questions, and then, you know, voila, automatic reversal on structural error. And so I think here, the proper analysis is Plain Error. And Katshedzian, the case that we've all been talking about, there, there was an objection raised to the juror. What happened in Katshedzian is simply that this court on review said the district court got the analysis wrong. So I think that's a different circumstance than we have here. I would instead point the court to Mitchell. And in Mitchell, also on Plain Error review, both sides expressly said, you know, we're not challenging this juror for cause, but the comments by the juror were, you know, yes, I think it will affect me. I mean, I think they were even more clear than, you know, a raising of a hand in this circumstance. But still, this court said that was not enough to put the district court on notice that they had a duty to strike this juror. Unless the court has any questions on any of the other issues? We ask that you affirm. Thank you. Thank you. Thank you, Your Honor. Judge Owens, may I have permission to return to your hypothetical? Sure. Your Honor, I think that hypothetical, which is similar to some hypotheticals the Eleventh Circuit case Togolov from 2016, illustrates exactly the key point from the Milhiser decision. The jury question that these facts present on the difficult question of whether somebody not only deceived, but cheated an individual out of the nature of the bargain. The question for the jury in this trial would be whether your purchase of the cookie as an essential element of the bargain to transact for the cookie was to support a cancer victim. And that's why you engaged in the transaction. Or, alternatively, you wanted a nice cookie at a good price that was comparable between the two and to support a family need was maybe a collateral part of your decision. How is that different than materiality? I don't know that it is different. I think perhaps Milhiser is refining the nature of materiality in helping us to understand the cheat component from the Miller case of to deceive and cheat for federal criminal fraud. And we can showcase very clearly in the Milhiser facts because in Milhiser, the court was presented with defendants who were selling printer toner. They lied about their identity as a business as being the business that had served this company in the past and lied about price points in the market. And you better lock in with us now to preserve the lower price point. And this court decided there was still a jury question that was not resolved under the model instructions about good faith and intent to repay in line with the Miller decision that required a new trial so that the jury could decide whether beyond a reasonable doubt those aspects of the transaction were essential to the nature of the bargain. And I would add that the court reversed without engaging in harmless error review because in Milhiser, as in here, the government did not argue harmless error in the answering brief on appeal. I would also add as a final note, the government has alluded in pointing to facts that it argues did resolve these jury questions in the initial trial to testimony from Mr. Hanson's own lawyers, Mr. Fullington and Ms. Hopkins. And I wanted to emphasize that for the reasons we argued in our opening and reply brief, that testimony never should have been submitted to the jury in the scope in which it was delivered in making comparisons between Mr. Hanson's circumstances and another individual who was engaging in purportedly similar conduct who had pleaded guilty to fraud, this information being delivered by Mr. Hanson's own lawyers presented to the jury along with documents citing to rules of professional conduct and moral objections. I think the key, again, returning to your hypothetical Judge Owens, is we have to distinguish between business practices we because deception is involved and it might even be deception that lures somebody into a transaction and deception that cheats somebody out of the nature or essential aspects of their bargain. Thank you very much, Your Honor. Thank you. I just have a couple of quick points on the juror bias issue. One really quick one is that a later question about the presumption of innocence cures the earlier problematic question. There's a whole section of Kitchezian's explicitly about that. The other issue I'd like to address is the idea that Juror 34 was rehabilitated at all, let alone in a way that could be perceived as good for the defense. As a defense lawyer, I can say that nobody who talks really about technicalities is somebody who I would want on a jury. When my mom actually referred to what I do as technicalities the other day, I was like, Mom, that's not true. What we ask judges and jurors to do is enforce the rule of law against the government. We ask appellate judges to enforce the rule of law against lower court judges. That's what we do. Referring to the defense function as playing around with technicalities and getting away with stuff, that is a common perception of what we do, but that is not actually a respectful and nuanced understanding or portrayal of what this job entails. I disagree that the juror was rehabilitated. I don't think that it's fair to speculate that the juror would have been a positive contribution to the jury from a defense perspective. I see that I'm running low on time unless the court has further questions. Thank you. You can tell your mom did a great job. Thank you. All right. Thank you all very much. Ms. Culbertson, Mr. Holland, Mr. Nelson, thank you for your oral argument presentations here today. The case of United States of America v. Bernard Ross Hansen and Diane Renee Erdman is now submitted.
judges: MURGUIA, McKEOWN, OWENS